2003 UT App 287

**STATE of Utah, Plaintiff and Appellee,**

v.

**Richard Anthony NICHOLS, Defendant and Appellant.**

**No. 20020686–CA.**

Court of Appeals of Utah.

Aug. 14, 2003.

---

Samuel D. McVey, Kirton & McConkie, and Lori J. Seppi, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., Jeffrey S. Gray, and Mark W. Baer, Asst. Attys. Gen., Salt Lake City, for Appellee.

Before JACKSON, P.J., GREENWOOD, and THORNE, JJ.

## OPINION

**GREENWOOD, Judge:**

¶1 Richard Nichols (Defendant) argues that the evidence was insufficient to sustain his convictions for five counts of communications fraud, second degree felonies, in violation of Utah Code Ann. § 76–10–1801(1)(d) (1999), and one count of racketeering, a second degree felony, in violation of Utah Code Ann. § 76–10–1603(3) (1999). Defendant also argues that the trial judge committed plain error by improperly questioning a witness. We affirm.

## BACKGROUND [1]

¶2 Defendant was charged with making false statements or withholding material information while he was employed by the consignment automobile dealership Remember When (the Dealership). Three separate transactions form the basis of Defendant's convictions. Conflicting evidence was presented at trial about Defendant's knowledge of the Dealership's financial problems. Defendant testified that he was not aware of the problems until April 1999, when he started receiving phone calls from customers complaining that they either were not paid for the sales of their cars or that they had not received title to the cars they had purchased. Despite these problems, Defendant testified that he continued to work at the Dealership because the owner, John Douglas, told him everything was being taken care of.

¶3 In contrast to Defendant's testimony, Douglas testified that the Dealership was having problems as early as December 1998, and that he was interested in selling the Dealership to Michael Gent, who was operating the business. Douglas also testified that he had several meetings with Defendant and Gent about consigners not being paid and buyers not receiving titles. According to Douglas, in June 1999, "We had ongoing discussions from the first of December when

---

1. " 'On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard.' However, we 'present conflicting evidence to the extent necessary to clarify the issues raised on appeal.' " *ProMax Dev. Corp. v. Mattson,* 943 P.2d 247, 250

n. 1 (Utah Ct.App.1997) (citations omitted). "Because the trial court had the opportunity to view these witnesses and weigh their credibility, we defer to its findings unless the record demonstrates clear error." *State v. Reed,* 839 P.2d 878, 880 (Utah Ct.App.1992); *accord* Utah R. Civ. P. 52(a).

the business was just at a total break even right through to when the lock was changed." Douglas stated that when Defendant spoke to him in April about the Dealership's financial problems, he told Defendant that he was working to get everyone paid.

¶ 4 Gent testified that he "believe[s]" he spoke to Defendant a few times about the Dealership's problems. He also testified that he attended a meeting in January 1999 with Douglas and Defendant, where they specifically discussed the Dealership's problems. They discussed paying the consigners by selling "more cars and then us[ing] the funds to pay those people." Defendant testified that he did not remember such a meeting.

### A. Dinter Corvette sold to Sanchez (Counts 6 & 7)

¶ 5 In counts 6 and 7 Defendant was charged with making misrepresentations or material omissions by reducing the selling price of Warren Dinter's 1975 Corvette without Dinter's knowledge, and by selling it to Albert Sanchez. Dinter testified that in September 1998, he arranged with Defendant to leave his 1975 Corvette Roadster on the lot, giving Defendant permission to sell the car for no less than $14,500. However, Defendant testified that Douglas told him the car was to be sold for $13,500. Dinter faxed a copy of the car title to the Dealership in April 1999 because Defendant said there was an interested buyer.

¶ 6 Albert Sanchez testified that he called the Dealership about the Corvette near the end of April 1999, and spoke with Defendant. Sanchez testified that during their second conversation, Defendant told him that the car could be purchased for $12,000 cash. Based on these conversations, Sanchez flew from his home in Colorado to Salt Lake City on April 30 with a cashier's check for $12,000. When he arrived at the Dealership, Defendant was out of town. Therefore, he dealt with Gent, who accepted Sanchez's check. When Sanchez was asked at trial how he knew it was Defendant he spoke with on the phone, Sanchez responded that while he could not describe Defendant's voice, he spoke to the same person on both occasions, and the person identified himself as "Richard Nichols, the sales manager."

¶ 7 Gent testified that although he spoke with Sanchez about the Corvette, he did not offer to sell the car for $12,000. Gent stated that Defendant prepared the paperwork for the Sanchez sale and that he completed the sale because Defendant was out of town. Gent also testified that before accepting Sanchez's check, he rewrote Defendant's paperwork because Sanchez said he should be exempt from sales tax as an out-of-state resident.

¶ 8 In contrast, Defendant testified that he never spoke to Sanchez about the Corvette or offered to sell the car for $12,000. Defendant stated that he spoke to Sanchez once, after the purchase was complete. Additionally, Defendant testified that he did not fill out the paperwork for the transaction; although the paperwork was filled out with his name, the handwriting was not his.

¶ 9 Dinter, the customer selling the Corvette, testified that shortly after April 30, the date of the sale, he called Defendant to follow up on the potential sale Defendant mentioned in his April call. He also wanted to inform Defendant that he would be out of town for several weeks. Dinter testified that during this conversation, Defendant said the car had not sold. When Dinter returned on June 7, he called Defendant, who had left several messages for Dinter. When the two spoke several days later, Defendant told Dinter that the car had sold, but that he did not know the particulars of the sale.

¶ 10 Sanchez testified that he eventually called Defendant about the title to the car, and was told that they were working on getting the title. After hearing nothing further, and not receiving the title, Sanchez filed a complaint with the Motor Vehicle Enforcement Division on June 18, 1999.

### B. Neeway Mustang sold to McLelland (Count 10)

¶ 11 Defendant was charged with misrepresenting or omitting to inform John Neeway of the date his car sold. Neeway took his 1966 Ford Mustang to the Dealership on May 28, 1998, and signed a contract to consign the car. In the following weeks, Neeway called Defendant several times to check on the car, and according to his testimony, he

spoke with Defendant each time. Neeway testified that Defendant's voice is very distinctive, and that "he sounds just like a friend of mine."

¶ 12 Dennis McLelland testified that he visited the Dealership May 1, 1999, because he was interested in buying the Mustang. He returned the next day and spoke with Defendant. McLelland testified that they agreed on the price of $8,400 and he paid Defendant.[2] McLelland was told he would receive the title in a few days.

¶ 13 Neeway testified that on May 17, 1999, Defendant called Neeway to ask for a copy of the title because he had an interested buyer. A copy of the title was faxed to the dealership sometime between May 12 and May 17, 1999.

¶ 14 Although McLelland testified that Defendant sold him the car, Defendant testified that Mark Daley, a new sales person hired by Gent, sold the Mustang. Defendant stated that he called Neeway on May 8, after the sale, to ask for a copy of the title, which was faxed four days later, on May 12. Defendant also testified that because Gent and Daley arranged to sell the car for less than the consignment deal, he called Neeway about the sale.

¶ 15 Neeway testified that after the mid-May title conversation he did not speak to Defendant, although he testified that he unsuccessfully tried to contact someone at the Dealership one or two times. On June 13 Neeway went to the Dealership where signs were posted indicating that the business was closed. He then learned from Gent and Defendant that his car had sold. Gent suggested that he fill out a stolen vehicle report with the Division of Motor Vehicles, as they could not pay him because the purchase money was in Douglas's account and neither Defendant nor Gent had access.

C. Nipper Chevy sold to Ludwig (Counts 12 & 13)

¶ 16 Count 12 charged Defendant with misrepresenting the date of the sale of Paul Nipper's 1957 Chevy Bel Air, and count 13 charged Defendant with misrepresenting to the Ludwigs, the purchasers, that the Dealership owned the Chevy. Nipper testified that he went to the Dealership on October 14, 1998, and consigned his 1957 Chevy Bel Air through Defendant. Nipper testified that he called Defendant weekly or bi-weekly from October through mid-February 1999. On February 17, Nipper drove by the Dealership and noticed that, although he had not been told of a sale, his car was not on the lot. He spoke with Defendant, who, according to Nipper, said that his car sold "this past week." When Nipper requested payment, Defendant sent him to Gent.

¶ 17 Defendant testified that he sold the car to the Ludwigs on January 16, 1999, but did not notify Nipper about the sale because, according to their business practice, that was the responsibility of Douglas or Gent. Defendant stated that when Nipper came to the Dealership he told Nipper the car had sold several months ago.

¶ 18 In contrast, Nipper testified that Gent told him the car was actually sold January 26. Based on that date, Nipper asked for payment on February 17, according to the terms in his consignment contract. At some point during this conversation, Defendant told Nipper that he was shocked that he had not been paid.

¶ 19 According to Nipper, between February 17 and March 22 he had several conversations with Gent. Nipper testified that Gent claimed that he had not paid Nipper because of a defect in the title. Eventually, Gent gave Nipper a check for $22,000, which bounced. In contrast, Gent testified that he first spoke with Nipper a few months after—or at least significantly after—the car sold. Gent did not recall Nipper ever asking the date of the sale. Gent also testified that he did not give the check to Nipper, and that he specifically told Defendant that the check Defendant gave Nipper would bounce. Defendant testified that Gent handed Nipper the check, and that he personally never touched it.

¶ 20 According to Defendant's testimony, after learning about Nipper's difficulty getting paid, he began to realize that sellers

---

2. The trial court's findings of fact state that the car was sold May 7, 1999. However, McLelland testified that he first visited the Dealership on May 1, and that he returned the next day, May 2, and negotiated the sale. There is no evidence in the record indicating another date.

were not being paid upon the sale of their cars. When customers called asking to be paid, Defendant would send them to Gent or Douglas because they controlled the business's finances. Defendant testified that Douglas told him that "it was all taken care of."

¶ 21 Both Jim and Ruth Ludwig testified concerning the allegation in count 13, Defendant's alleged misrepresentation that the Dealership rather than the consigner owned the car. Jim Ludwig testified that on January 16 Defendant stated "we" own the car, which came from Florida. Ruth Ludwig also testified that Defendant said the car was from Florida and it is "ours," or "this is our car." Jim Ludwig testified that, based on Defendant's statements, he understood that the Dealership owned the car. The couple returned to the Dealership that day after securing financing, and purchased the car through Defendant. Jim Ludwig testified that he assumed he would get the title to the car when the loan was paid off, but that he did not discuss the title with Defendant.

¶ 22 Despite paying the loan off, the Ludwigs never received the title. Jim Ludwig testified that Defendant told him they were having trouble because the title was in Florida. Around March 30, Jim Ludwig called Defendant about the title and was told to talk to Gent. Ruth Ludwig testified that when she called Defendant on April 9, he still had no explanation for the title problems.

¶ 23 Finally, Gent testified that he never had a conversation with the Ludwigs until the title and license plate concerns arose. Gent stated that he then discussed the title problems with the Ludwigs and that he never told them the title was clear, although he did tell Defendant that the title was clear.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 24 Defendant argues that the evidence is insufficient to support his convictions for communications fraud and racketeering. "When reviewing a bench trial for sufficiency of evidence, we must sustain the trial court's judgment unless it is against the

clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Larsen*, 2000 UT App 106,- ¶ 10, 999 P.2d 1252 (quotations and citation omitted).

¶ 25 Defendant also maintains that the trial court committed error when it questioned a witness and ignored defense counsel's evidentiary objections. Because Defendant did not object to the court's questioning, he must demonstrate plain error on appeal. *See State v. Kell*, 2002 UT 106,¶ 45, 61 P.3d 1019 ("Because defendant did not object to the comments during the trial, we review this issue for plain error.").

## ANALYSIS

### I. Sufficiency of the Evidence

¶ 26 Defendant argues that the evidence was insufficient to sustain his convictions.[3] According to the communications fraud statute,

> Any person who has devised any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who communicates directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of:
>
> . . . .
>
> (d) a second degree felony when the value of the property, money, or thing obtained or sought to be obtained is or exceeds $5,000. . . .

Utah Code Ann. § 76–10–1801(1) (1999). In this case, the trial court found that Defendant had devised a scheme or artifice to defraud the Dealership's customers. The court also found that Defendant made misrepresentations or material omissions related to all the counts on which Defendant was convicted.

---

**3.** Defendant marshals the evidence in his brief, recognizing that he " 'must marshal all of the evidence in support of the trial court's findings of fact and then demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings against an attack.' " *State v. Larsen*, 2000 UT App 106,¶ 11, 999 P.2d 1252 (citation omitted). The State does not challenge the adequacy of Defendant's marshaling.

¶ 27 In many of Defendant's arguments on appeal, he takes issue with the trial court's credibility determinations. However, this court has held, "[b]ecause the trial court had the opportunity to view these witnesses and weigh their credibility, we defer to its findings unless the record demonstrates clear error." *State v. Reed,* 839 P.2d 878, 880 (Utah Ct.App.1992); *accord* Utah R. Civ. P. 52(a). The Utah Supreme Court has stated "that it is not the function of appellate courts 'to determine the credibility of conflicting evidence or the reasonable inferences to be drawn therefrom.' " *Reed,* 839 P.2d at 880 (quoting *State v. Bagley,* 681 P.2d 1242, 1244 (Utah 1984)). In this case, the trial court assessed the credibility of the witnesses, stating, "[A]s I make a decision regarding the issue of whether or not the defendant is guilty of communications fraud, it becomes a credibility issue."

¶ 28 The trial court found that Defendant's testimony was not credible, in part because of the numerous inaccuracies in his testimony. The court noted, "There is also testimony from almost every victim in this case that directly contradicts [Defendant]." Discussing the testimony of the victims and other witnesses, the court stated that they had little motivation to fabricate testimony. It found that while it "didn't place much credibility on Mr. Gent's testimony unless it was corroborated.... [H]is reason for fabrication at this point seems not to be extremely high." Finally, the court specifically found that Douglas was credible.

¶ 29 Because the court "had the opportunity to view these witnesses and weigh their credibility, we defer to its findings." *Id.* Therefore, we do not specifically address Defendant's arguments claiming error in the trial court's credibility determinations.

### A. Dinter Corvette sold to Sanchez (Counts 6 & 7)

■ ¶ 30 The trial court acknowledged the conflicting testimony about Defendant's interactions with Dinter and Sanchez. Accordingly, the court made a credibility determination that Sanchez, the victim, had little basis to fabricate testimony, and Defendant's testimony was inaccurate "on numerous occasions." Specifically, the court found that Defendant "reduced the price without the consent of Mr. Dinter and told Mr. Sanchez that if he brought the $12,000 cash by the end of the week that he could purchase the vehicle." Based on these misrepresentations and omissions, communicated directly or indirectly with Dinter and Sanchez for the purpose of executing or concealing the scheme, the trial court found Defendant guilty on counts 6 and 7.

¶ 31 Defendant argues that the evidence is not sufficient to show that he sold Dinter's car or that he reduced the asking price for Sanchez. However, to prevail on his sufficiency of the evidence claim, Defendant must show the trial court's judgment is "against the clear weight of the evidence." *State v. Reed,* 839 P.2d 878, 879 (Utah Ct.App.1992) (quotations and citations omitted).

¶ 32 Dinter testified that he did not authorize Defendant or the Dealership to sell the Corvette for less than the agreed upon amount. Sanchez testified that on two occasions he and Defendant spoke on the phone, and on the second occasion Defendant agreed to sell the car for $12,000 cash. Sanchez testified that he worked with Gent on the sale because Defendant was out of town. Further, Gent testified that Defendant prepared the paperwork for the sale of the Corvette and that he completed the sale because of Defendant's absence. In contrast, Defendant testified that he only spoke with Sanchez after he bought the Corvette, he never offered to sell the car for $12,000, and he did not complete the paperwork for the sale.

¶ 33 Based on the weight of the evidence and the credibility of the witnesses, we affirm Defendant's conviction on counts 6 and 7.

### B. Neeway Mustang sold to McClelland (Count 10)

■ ¶ 34 The trial court found that McClelland bought Neeway's Mustang the first week of May 1999 and that Neeway first learned of the sale when he visited the Dealership on June 13, 1999. Based on this finding the trial court concluded that Defendant misrepresented the date of sale and thus was guilty of a material omission, as more than one month passed before Neeway

learned of the sale. Testimony about Defendant's phone call to Neeway and about the date of the sale was conflicting.

¶ 35 Defendant first argues that he did not misrepresent or omit to inform Nipper that McLelland bought his car. Defendant relies on Neeway's trial testimony that Defendant told him in mid-May that "there was a sale—that somebody was interested in purchasing the vehicle.... Something along that line." He argues that Neeway's statement—"there was a sale"—demonstrates that the trial court's finding that he omitted to inform Neeway of the sale is against the clear weight of the evidence. However, Neeway also testified that he was not told of a sale until June 13, and that during the mid-May conversation with Defendant, Defendant said that someone was looking at the vehicle, not that it had been sold.

¶ 36 We review this evidence to determine whether it is sufficient to uphold the conviction, and "we must sustain the trial court's judgment unless it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Larsen*, 2000 UT App 106,¶ 10, 999 P.2d 1252 (quotations and citation omitted). This conviction is not against the clear weight of the evidence: McLelland testified that Defendant sold him the car on May 2, and Neeway testified that he first learned of the sale on June 13. Thus, the evidence was sufficient for the court to find a misrepresentation or material omission regarding the date of sale.

C. Nipper Chevy sold to Ludwig (Count 12 & 13)

¶ 37 On count 12, the trial court found Defendant made misrepresentations and material omissions to Nipper about the date his vehicle sold. On count 13, the court found that Defendant misrepresented to the Ludwigs that the Dealership, rather than Nipper, owned the vehicle.

¶ 38 Defendant argues that Nipper's testimony at trial was inconsistent with statements he made in an affidavit. In the affidavit, Nipper stated that it was early March 1999 when he discovered that his Chevy was not at the Dealership. The affidavit also states that no one at the Dealership could tell Nipper whether the car had been sold, and

that he only learned the date of sale several days later. Defendant emphasizes that these statements are inconsistent with Nipper's trial testimony stating that he first discovered his car was not at the Dealership on February 17. Defendant also argues that statements in Nipper's affidavit corroborate Defendant's testimony that Nipper visited the Dealership on March 22, at which time Defendant told Nipper that the car sold several months earlier.

¶ 39 At trial, Nipper testified that Defendant told him on February 17 that the car sold "this past week," and Gent told him the car sold on January 26. Defendant testified that the car sold on January 16, and that when Nipper came to the Dealership he said it sold a couple of months earlier. Defendant also argues that he did not omit to inform Nipper of the sale, as that was the responsibility of Gent or Douglas.

¶ 40 On the count of misrepresenting ownership of the car to the Ludwigs, the court found that Defendant made statements to both of the Ludwigs that the Dealership owned the car. The Ludwigs both testified that Defendant said "we" own the car and "this is our car." The court also found that there were no title problems, despite Defendant's statements to the contrary. Based on these misrepresentations, the trial court convicted Defendant on this count.

¶ 41 Again, we will not overturn a trial court's judgment on a bench trial "unless it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Larsen*, 2000 UT App 106,¶ 10, 999 P.2d 1252 (quotations and citation omitted). Here, the trial court's judgment is not against the clear weight of the evidence, and we therefore affirm Defendant's convictions.

D. Racketeering

¶ 42 Defendant argues that his racketeering conviction under Utah Code Ann. § 76-10-1603(3) (1999) also should be reversed based on insufficiency of the evidence. Under section 76-2-1603(3), "[i]t is unlawful for any person employed by or associated with any enterprise to conduct or participate,

whether directly or indirectly, in the conduct of that enterprise's affairs through a pattern of unlawful activity." Utah Code Ann. § 76–10–1602(2) (1999) defines "pattern of unlawful activity" as "engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics."

¶ 43 Defendant maintains that the evidence was not sufficient to show "the business intended to defraud" the consigners, as it only showed that he "knew that the consignors had not yet been paid." In response, the State maintains that the evidence was sufficient to show that Defendant had more than a general knowledge of the Dealership's financial problems, and that Defendant participated in a scheme to defraud through a pattern of unlawful activity. The trial court stated,

> There is no question from the multitude of testimony that was heard by this court that there were misrepresentations and omissions as it relates to vehicles that were consigned and vehicles that were purchased at that particular enterprise. There's no question in this Court's mind ... that the defendant was involved in that to the extent that he knew of the problems.... He did nothing to stop those but in fact participated....

■ ¶ 44 In this case, the evidence is sufficient to convict Defendant of engaging in a pattern of unlawful activity. His convictions for five counts of communications fraud consist of more than three episodes of unlawful activity, as required by the statute. Therefore, we uphold Defendant's conviction for racketeering.

4. The questioning at issue was as follows:
 Court: What was Mr. Nichols' position after January of 1999 at Remember When?
 Witness: It is my understanding that first of all he was the sales manager for Mr. Gent and then became a partner with Mr. Gent.
 Defense: Objection, lack of foundation and hearsay.
 Court: How did you determine that?

## II. Questioning by Trial Court

¶ 45 Defendant argues that the trial judge abandoned its role as an impartial adjudicator by questioning John Douglas, one of the State's witnesses. Because Defendant did not object to the court's questioning, he must demonstrate plain error on appeal. *See State v. Kell,* 2002 UT 106, ¶ 45, 61 P.3d 1019 ("Because defendant did not object to the comments during the trial, we review this issue for plain error."); *see also State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993) (stating to establish plain error a defendant must show: "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful").

■ ¶ 46 Under rule 614(b) of the Utah Rules of Evidence, "[t]he court may interrogate witnesses, whether called by itself or by a party." In this case, the trial court questioned Douglas about Defendant's position at the Dealership and his possible partnership with Gent in a business called Cruisin' Classics.[4] Defendant argues that these questions were improper because the judge had previously stated, "unless counsel in closing arguments can tell me how Cruisin' Classics and Customs has any bearing on this case, I won't consider it at all to make my decision." Later, in its Findings of Fact, the trial court referred to testimony from the colloquy. Defendant also argues that it was plain error because the trial judge failed to rule on his objections during the questioning.

■ ¶ 47 In this case, the court questioned Douglas to help clarify whether Defendant's earlier testimony was credible. "It is within the judge's prerogative to 'ask whatever questions of witnesses as in his judgment is necessary or desirable to clarify, explain or add to the evidence as it relates to the disputed issues.' " *State v. Boyatt,* 854 P.2d 550, 553 (Utah Ct.App.1993) (quoting *State v. Mellen,* 583 P.2d 46, 48 (Utah 1978)). The trial court precluded testimony about Crui-

 Witness: I was told by several people that were involved with the business and by the landlord that Mr. Nichols and Mr. Gent were forming some type of partnership.
 Defense: Objection, same objection, Your Honor.
 Court: I'm talking before June 13th of 1999.
 Witness: That's correct.

sin' Classics before Douglas testified. Only after Douglas stated that Gent and Defendant became partners, contradicting Defendant's earlier testimony that he and Gent did not get along, did the court seek clarification by questioning Douglas about Defendant's relationship with Gent. Defendant's argument that the trial court's action amounts to plain error therefore fails. It was "within the judge's prerogative to ask whatever questions of witness as in his judgment is necessary or desirable." *Id.* (quotations and citations omitted).

 ¶ 48 Further, even if it was error for the trial court to solicit testimony about the partnership arrangement of Cruisin' Classics after ruling that Cruisin' Classics testimony was inadmissible, the error was harmless. " 'If the error was harmless, that is, if the error was sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the case, then a reversal is not in order.' " *Armed Forces Ins. Exch. v. Harrison,* 2003 UT 14, ¶ 22, 70 P.3d 35 (citations omitted). In this case, the trial court's questioning of Douglas is "sufficiently inconsequential," *id.,* and does not warrant reversal. Defendant argues that, because the trial court mentions testimony from the colloquy in its findings, the testimony amounts to plain error. However, the court relied on numerous grounds for its credibility determination about Defendant. Indeed, the court weighed the evidence and noted Defendant's inconsistencies. The court also found that "testimony from almost every victim in this case . . . directly contradicts [Defendant]." Because evidence for the court's credibility determination was ample and the court did not rely only on the disputed portion of Douglas's testimony, Defendant's plain error argument fails.

 ¶ 49 Defendant also argues that it was error for the trial court to ignore his objections and continue questioning Douglas. A trial court should clearly rule on objections made during trial. The court in this case was remiss when it failed to do so. While this failure may have been error, it was harmless error and does not warrant reversal. *See id.* Further, we note that a trial court should avoid assuming the role of the prosecutor. In *State v. Gleason,* 86 Utah 26, 40 P.2d 222 (1935), the supreme court stated, "It is generally held that in the exercise of his right to question a witness, the judge should not indulge in extensive examination or usurp the function of counsel." *Id.* at 227; *see also State v. Mellen,* 583 P.2d 46, 48 (Utah 1978) ("[T]he judge should and normally does exercise restraint in examining witnesses, so that he does not unduly intrude into the trial or encroach upon the functions of counsel.").

¶ 50 In this case, questioning by the trial court was not plain error, and Defendant's argument therefore fails.

## CONCLUSION

¶ 51 The evidence in this case was sufficient for the trial court to convict Defendant of five counts of communications fraud and one count of racketeering. The trial court's judgment was based on ample testimony and was not against the clear weight of the evidence. Further, we defer to the trial court's credibility determinations in this case. Finally, we conclude that the trial court did not commit plain error, as Defendant argues, when it questioned a witness. We therefore affirm Defendant's convictions.

¶ 52 WE CONCUR: NORMAN H. JACKSON, Presiding Judge, and WILLIAM A. THORNE JR., Judge.