**2021 UT App 15**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KEVIN JOSEPH BETONY,
Appellant.

Opinion
No. 20190357-CA
Filed February 11, 2021

Fifth District Court, St. George Department
The Honorable John J. Walton
No. 161501888

Nicolas D. Turner, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

ORME, Judge:

¶1      Kevin Joseph Betony appeals his conviction on ten counts
of aggravated sexual abuse of the three children of his
then-girlfriend (Mother). Notably, Betony contends that the trial
court applied the wrong legal standard when it excluded, as
privileged, certain mental health records belonging to the eldest
of his three victims. We affirm.

## BACKGROUND[1]

### *Abuse*

¶2      To protect the privacy of the minor victims in this case, we adopt the pseudonyms used by the State in briefing: Andrew, Beth, and Cole. *See* Utah R. App. P. 24(d). From the time Andrew, the eldest, was six or seven years old, he and his siblings lived with their grandparents. At the time they first moved in with their grandparents, Mother's marriage to Beth's and Cole's biological father and Andrew's adoptive father (Ex-husband) was coming to an end due to drinking and "lots of fighting." Mother abused Andrew physically and verbally for a year or two before he and his siblings went to live with their grandparents. Mother later told Andrew that Ex-husband, whom Andrew did not remember well, sexually abused him during that time, but Andrew has no independent recollection of this.

¶3      While the children lived with their grandparents, Mother began a relationship and moved in with Betony. When Andrew was approximately eleven years old, the children's grandfather passed away and the children went to live with Mother and Betony. There, they lived in a three-bedroom house in which Mother shared a bedroom with Betony, Andrew and Cole shared a bedroom, and Beth had her own bedroom.

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard. However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Nichols*, 2003 UT App 287, n.1, 76 P.3d 1173 (quotation simplified).

¶4 Mother's relationship with Betony was likewise marred by drinking, "a lot of arguing," and physical altercations. Cole described the living situation as "chaotic" because "[t]here was a lot of abuse and there was not very much thought taken in account to help raise" the children. Andrew testified that over the approximately three-year period that the children lived with Mother and Betony, "almost every day something physically violent was happening." Andrew worried for his and his siblings' safety because Betony "punched, slapped, pushed [him] into things" and "was just very temperamental." Beth thought Betony was "rude" and "scary" because he "yelled a lot." Mother also physically abused the children during this time.

¶5 Shortly after the children moved back in with her, Mother found employment in a different city that required a round-trip commute of nearly two hours. While she was gone, she left the children with Betony, who was rarely employed. It was during this time that Betony began sexually abusing the children.

¶6 Betony routinely raped and sodomized Andrew "almost every day"—most frequently while Mother was away at work—in the bedroom Mother shared with Betony. Andrew, who was "terrified" of Betony, would think, "I need to do this or I'm going to get hurt." Occasionally, Betony threatened to "break [Andrew's] arms and legs" and "kill [his] mom in front of [him]" if Andrew told anyone about the abuse. Andrew eventually told Mother of the abuse when he was thirteen, but she did not believe him. Betony continued to abuse Andrew following that disclosure.

¶7 Betony also sexually abused Beth, who was two years younger than Andrew, "once or twice a week" over a two- or three-year period. Beth was afraid to tell anyone of the abuse because Betony threatened, among other things, that he "and his entire family would murder [her] and anyone [she] ever met" if she told anyone about it. She finally disclosed the abuse to

Mother when she was ten, but Mother accused her of lying and "yelled at [her] for saying such things."

¶8     Betony sexually abused Cole, the youngest, "almost every day." Betony threatened Cole more than once that if he ever told anybody about the abuse, he would hurt his siblings. Cole told Mother once, but she did not believe him and "ignored it." Cole did not know that Betony was also abusing his siblings.

¶9     When Andrew was thirteen, he attended weekly sessions with the school psychologist. He disclosed Betony's physical abuse of him a couple of times to the psychologist and eventually disclosed the sexual abuse as well. It was shortly after this that Andrew reported the sexual abuse to Mother for the first time, but she did not believe him. The psychologist contacted the school resource officer, and Andrew disclosed the same abuse to him. A social worker followed up with the children, but they did not reveal their sexual abuse at that time, and the case was closed as unsupported.

¶10     Betony's abuse of the children finally ended when he was arrested on unrelated grounds shortly after the social worker closed the case. He and Mother had gotten into a physical altercation that prompted their neighbors to call law enforcement, and responding officers subsequently arrested Betony. He did not return to the house following the arrest, and the children did not see him again until his trial in the instant case.

¶11     A couple days after the arrest, Mother overhead Andrew saying that he wanted to hurt himself, and she contacted law enforcement to have him committed to a hospital. Once committed, Andrew told a nurse and a law enforcement officer that Betony had sexually abused him as recently as two or three days earlier. A physical examination was conducted, and the examining doctor took a sample from Andrew's anal area that

later tested positive for sperm.[2] Oddly, given the reliability of such tests, the sample was not tested for DNA, but Andrew testified that it belonged to Betony.

¶12 A detective arrived at the hospital and spoke with Andrew about the allegations. Following that interview, the detective met and spoke with Mother, Beth, and Cole in their home. The detective interviewed Beth and Cole individually, but he did not ask Mother to leave the house, due to inclement weather. Neither child disclosed their sexual abuse to the detective. The detective did not speak with Betony because he could not locate him.

¶13 Later, a second detective was assigned to the case and found Betony in jail. He arranged to interview him at the sheriff's office. During the interview, when the detective brought up sexual abuse, Betony responded that Ex-husband, who died a few months after the death of the children's grandfather, had abused the children, not Betony. Betony also stated that he believed that the children were engaging in sexual behavior with each other, but he ended the interview and sought counsel when

---

2. Specifically, the examining doctor testified that the sample "came back 2+ spermatozoa," indicating the presence of sperm. She further explained that the "2+" value represented the volume of sperm found. On cross-examination, Betony's counsel produced an article that does not appear in the record, but which apparently stated that the 2+ value actually meant "that [the] sperm is less than 24 hours old," meaning that it could not belong to Betony who had last seen Andrew two or three days prior to the sample being taken. Following a review of the article, the examining doctor stated that she and the article were "talking about two different things" and maintained that the 2+ value indicated "quantity" or "volume," and not the age of the sperm.

the detective asked him whether he had inappropriately touched Andrew. While waiting to return to his jail cell, Betony volunteered to the detective that on one occasion after he had passed out from drinking, he awoke to Andrew "touching him." He stated that he spoke with Andrew about it and explained to him that such behavior was a mistake.

¶14 Following Betony's arrest, Mother and the children were evicted from their home and began living in motels. Mother's physical abuse of the children worsened at this time, and she would also abandon them for anywhere between five hours to three days at a time to go gambling in Nevada. Police intervened following an incident in which Beth and Cole, while Mother was gone, walked from their motel to a fast-food restaurant to ask for something to eat. Following the intervention, the children moved back in with their grandmother for a short while and then entered the foster care system. Beth and Cole were eventually adopted by one of their foster families, while Andrew declined adoption and opted to return to Mother.

¶15 After entering foster care, approximately one year after the abuse had ended, Beth and Cole disclosed Betony's sexual abuse of them to authorities during an interview at the local Children's Justice Center (CJC). They also later discussed the abuse with their therapist and their new adoptive father.

*Betony's Motion to Produce Treatment Records*

¶16 In October 2016, the State charged Betony with ten first-degree-felony counts of sexual abuse of a child. Having previously been treated by Magellan Academy, Andrew was attending therapy sessions at Southwest Behavioral Health Center by 2018. In November of that year, Betony moved to

compel production of Andrew's mental health records from both Southwest and Magellan.[3]

¶17    The State initially opposed Betony's motion. But in December 2018, Andrew, then seventeen, disclosed to a Southwest therapist that "he was being pimped out by a neighbor" who was "forcing him or assisting him in having sexual relations with numerous adults." At a subsequent interview at the CJC concerning those allegations, Andrew said he had only once traded sexual relations with an adult for "food or other favors." This contradicted what Andrew told his Southwest counselor. Based on this new information, the State "stipulated that there is a reasonable certainty of [the Southwest] records containing exculpatory evidence favorable to the defense," and the trial court ordered that those records be produced for in camera review.[4]

¶18    Betony requested that the Magellan records likewise be produced for in camera review, arguing that Andrew's "lying to his current therapist creates a more likely than not situation that other lies about being abused by adults are contained in his other treatment records, including at Magellan Academy." Betony also argued that the Magellan records could provide "a diagnosis of an underlying mental disorder," evidencing that

---

3. Betony also sought to compel production of Beth's and Cole's therapy records. The court denied Betony's motion with respect to them, and Betony does not appeal that denial.

4. With origins in Latin, where "camera" means "chamber," in camera review or inspection refers to "[a] trial judge's private consideration of evidence." *See In Camera Inspection*, Black's Law Dictionary 878 (10th ed. 2014). *See also In Camera, id.* (defining "in camera" as "[i]n the judge's private chambers" or "[i]n the courtroom with all spectators excluded").

Andrew "cannot tell fact from fantasy." The State continued to oppose the production of the Magellan records.

¶19 At a later hearing, the court stated that the Magellan records presented a "close[] call" as to whether they satisfied the "reasonable certainty" test[5] and that it wanted "to give it some more thought." The court had not yet received the records for in camera review, but because the Southwest records, which it intended to review, were supposed to arrive "any day now," the court scheduled a second hearing for the following week.

¶20 At the second hearing, the court revealed that it had not yet received the Southwest records but that it had received the Magellan records, which it went ahead and reviewed. It stated:

> The fact is that in this case, prior to the Court reviewing the memoranda that the parties have filed that essentially litigates the issue of whether those records should be disclosed, the Court, when it received the Magellan records, reviewed the Magellan records, which is not the way it's

---

5. Under the reasonable certainty test, "to access in camera review to privileged records, Defendant must show that the records he seeks exist and that there is reasonabl[e] certainty that they will contain exculpatory evidence that is favorable to his defense." *State v. Worthen*, 2008 UT App 23, ¶ 28, 177 P.3d 664, *aff'd*, 2009 UT 79, 222 P.3d 1144. If the test is met, the court will conduct an in camera review for materiality to determine whether "there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different." *State v. Blake*, 2002 UT 113, ¶ 23, 63 P.3d 56. If the court determines that the privileged records contain material information, that information must be disclosed to the defense. *See State v. Bell*, 2020 UT 38, ¶ 1 n.1, 469 P.3d 929.

> supposed to work . . . but the Court has reviewed the records.
>
> As I noted last week in not ruling on the Magellan records . . . , I think it's a close call as to whether there is a reasonable certainty that they[] . . . would contain exculpatory information, but the records have been reviewed. I will—as a practical matter then, . . . rul[e] that there . . . are grounds . . . to review those records. The Court has reviewed them and . . . has determined that there is nothing exculpatory in those records . . . and nothing that would appear to be helpful to Mr. Betony's case.

Accordingly, the court entered an order denying Betony's request for disclosure of the Magellan records. When the court eventually received the Southwest records, it determined that they did "contain potentially exculpatory evidence" and ordered their disclosure.

*Trial*

¶21 Betony's case was tried to the bench. As part of his defense, Betony called a clinical psychologist (Psychologist) who reviewed "multiple records," including video recordings of three CJC interviews, a report by a child forensic interview specialist, medical reports, police reports, and the Southwest records. He also heard trial testimony, including that of the children, and adjusted his report accordingly.

¶22 Based on his review of the foregoing, Psychologist testified that "within a reasonable degree of professional forensic psychological certainty, the children's testimony has been tainted by the effects of repeated trauma as well as multiple suggestive influences" and that "severe trauma plus suggestive taint equals unreliable testimony." Specifically, he stated that

"there's a definitive link between severe psychosis . . . and trauma," with psychosis meaning that "your mind doesn't function and you have lost track of reality." He testified that he "found multiple instances throughout reading the discovery and also while listening to the witnesses here where severe trauma has been present within the family system," but he stated that he could not identify how the trauma "specifically affected each of these kids" because he had not personally examined them. Although he could not conclude that any of the children suffered from psychotic disorders, he stated that "in situations of trauma and severe trauma, it is possible that children could develop psycho[ses]." He also testified that "suggestive influences from the environment can taint the children's testimonies" and that his review of the records and trial testimony suggested that the children's accounts of abuse by Betony were tainted by outside influences.

¶23 Concerning Andrew, Psychologist testified that based on a report made when Andrew was thirteen, Andrew was then functioning at the level of an eight- or nine-year-old, which the report characterized as a "mild learning disability." Psychologist testified that there was no evidence supporting the report's conclusion that Andrew's learning disability was "mild," and he believed that the learning disability was "[m]ore serious than mild." Psychologist also testified that the report indicated that Andrew was taking a medication that "can cause suicidal behaviors and potentially psychotic behaviors [i]n children."

¶24 Based on his review of the Southwest records, Psychologist stated that they indicated that Andrew was receiving a form of therapy that, to his knowledge, is exclusively used to treat borderline personality disorder. Notably, Psychologist testified that the specific treatment "is designed to treat impairments in self-direction, impairments in intimacy; it's in terms of dishonesty and deceitfulness, and also impulsivity and risk-taking." But Psychologist emphasized that he had not

diagnosed Andrew and "at no time [was he] stating that [Andrew] has borderline personality disorder or any other disorder." Psychologist also stated that the records revealed that Andrew was being bullied at school, which was another potential trauma he was experiencing, beyond his dysfunctional family system. Following further testimony, Psychologist concluded, "Within a reasonable degree of forensic psychological certainty, it is my belief that the effects of trauma and extensive trauma have made [Andrew's] testimony unreliable."

¶25 At the conclusion of a two-day bench trial, the trial court found Betony guilty on all ten counts of aggravated sexual abuse of a child. The court later sentenced Betony to ten consecutive statutory terms of fifteen years to life. Betony appeals.

### ISSUE AND STANDARD OF REVIEW

¶26 Betony raises one issue that merits our full consideration.[6] He argues that the trial court erred in not ordering disclosure of

---

6. Betony also argues that his trial counsel rendered ineffective assistance by not calling an expert to refute the examining doctor's testimony that the 2+ value on the laboratory report merely indicated volume of sperm present, not motility or age. *See supra* note 2. He contends that "trial counsel exhibited deficient performance by not calling his own expert to examine the lab reports and discuss the motility of the sperm" because "it could have been possible to show that the sperm did not belong to Betony, which was the defense that trial counsel was trying to present." Betony further asserts that he was prejudiced by this deficient performance because the theorized defense expert's testimony "is likely to have provided him a different outcome since [the sperm] was one of only a few tangible pieces of

(continued…)

the Magellan records to him following its in camera review of them. "When the existence of a privilege (or an exception to a privilege) turns on a question of law, we review for correctness." *State v. Bell*, 2020 UT 38, ¶ 10, 469 P.3d 929 (quotation simplified). "If the existence of a privilege (or exception) turns on questions of fact, we give deference to the district court's underlying fact finding and do not set those findings aside unless they are clearly erroneous." *Id.* (quotation simplified).

## ANALYSIS

¶27 Rule 506(b) of the Utah Rules of Evidence protects, as privileged, confidential communications between a patient and a physician or mental health therapist made for purposes of diagnosis or treatment. There are, however, four exceptions to this privilege. *See* Utah R. Evid. 506(d). One of the exceptions outlined in subsection 506(d)(1) is relevant here. That exception provides that confidential communications "relevant to an issue

---

(…continued)

evidence to support the crimes committed." But on this record, Betony has not established that an expert exists who would interpret the 2+ level as indicative of sperm age, nor has he moved to supplement the record under rule 23B of the Utah Rules of Appellate Procedure to make that showing. *See State v. Burnside*, 2016 UT App 224, ¶ 38, 387 P.3d 570; *State v. Gerber*, 2015 UT App 76, ¶¶ 14–15, 347 P.3d 852. Indeed, even the article on which Betony's counsel relied during cross-examination of the examining doctor does not appear in the record. Accordingly, because "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality," *Burnside*, 2016 UT App 224, ¶ 38 (quotation simplified), Betony has not met his burden of establishing that he received ineffective assistance of counsel.

of the physical, mental, or emotional condition of the patient" are not privileged "in any proceeding in which that condition is an element of any claim or defense." *Id.* R. 506(d)(1)(A).

¶28    To establish the applicability of this exception, a party must satisfy a series of inquiries. "[T]he threshold test of a rule 506(d)(1) exception is whether the party [asserting applicability of the exception] has sufficiently alleged that the witness' mental or emotional condition itself is an element of any claim or defense." *State v. Worthen*, 2009 UT 79, ¶ 19, 222 P.3d 1144. Betony's satisfaction of this threshold test is not at issue here.

¶29    Next, the inquirer must meet the reasonable certainty test by showing, "with reasonable certainty,[7] that the sought-after records actually contain exculpatory evidence which would be favorable to his defense." *Id.* ¶ 38 (quotation simplified). "This is a stringent test, necessarily requiring some type of extrinsic indication that the evidence within the record exists and will, in fact, be exculpatory." *Id.* (quotation simplified). *See also State v. Bell*, 2020 UT 38, ¶ 24, 469 P.3d 929 ("Generally, this requires that a criminal defendant identify his or her specific and narrow defense, and then offer extrinsic evidence that ties the patient's condition to the specific records requested.") (quotation simplified). "The difficulty in meeting this test is deliberate and prudent in light of the sensitivity of these types of records and the worsening of under-reporting problems in the absence of a strong privilege." *State v. Blake*, 2002 UT 113, ¶ 19, 63 P.3d 56. *See also Bell*, 2020 UT 38, ¶ 24 ("[T]his test seeks to narrow the scope of the criminal defendant's request, and thereby prevent

_____

7. Our Supreme Court has "likened reasonable certainty in sexual abuse cases to the more stringent side of more likely than not." *State v. Worthen*, 2009 UT 79, ¶ 38, 222 P.3d 1144 (quotation simplified).

criminal defendants from unnecessarily engaging in a 'fishing expedition' through a patient's mental health therapy records.").

¶30　Lastly, if the reasonable certainty test is met, the trial court will then conduct an in camera review of the records for materiality. *See Worthen*, 2009 UT 79, ¶ 43; *Blake*, 2002 UT 113, ¶ 23. *See also State v. Worthen*, 2008 UT App 23, ¶ 11 n.2, 177 P.3d 664 ("In the context of sexual abuse cases, in camera review is typically required in order to serve the defendant's interests without destroying the State's need to protect the confidentiality and privacy of sexual abuse victims.") (quotation simplified), *aff'd*, 2009 UT 79, 222 P.3d 1144. Evidence is material "where there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different." *Worthen*, 2009 UT 79, ¶ 43 (quotation simplified). Upon satisfaction of this final inquiry, the defendant is entitled to access the requested records and use them in his defense.

¶31　Betony argues that in conducting an in camera review of the Magellan records, the trial court improperly applied the more stringent reasonable certainty test instead of reviewing for materiality. He bases this assertion on the court's statements at the second hearing that (1) "it's a close call as to whether there is a reasonable certainty that [the Magellan records] . . . would contain exculpatory information" and (2) the Magellan records contained "nothing exculpatory . . . and nothing that would appear to be helpful to [his] case." He argues that because the court characterized it "a close call" as to whether the Magellan records satisfied the higher reasonable certainty test, "it is clear that [the records] would meet the lower standard of materiality" and, therefore, fall within the rule 506(d)(1)(A) exception.

¶32　Betony's argument misunderstands the interplay between the reasonable certainty test and the later in camera review for materiality. The high burden of the reasonable certainty test rests in the requirement that the defendant identifies a narrow

defense and produces extrinsic evidence tying the patient's condition to the requested records. *See Bell*, 2020 UT 38, ¶ 24. *See also Worthen*, 2009 UT 79, ¶ 19 (stating that under the reasonable certainty test, the defendant must "show[] that the records contain exculpatory evidence to a reasonable certainty"). In other words, the defendant must show, to a reasonable certainty, that the requested records contain information supporting his or her narrowly identified defense. Mere speculation or general requests for "any [exculpatory] material that might happen to be found in the privileged records" will not satisfy the test. *See Blake*, 2002 UT 113, ¶¶ 21–22. Instead, "[a]t a minimum, specific facts must be alleged," such as "references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that might lead to uncertainty regarding a victim's trustworthiness." *Id.* ¶ 22. Thus, in this sense, the reasonable certainty test is certainly "stringent." *Id.* ¶ 19.

¶33 The reasonable certainty test is not, however, stringent in terms of how exculpatory or material the information within the requested records must be. Indeed, the opposite of Betony's argument is true. During its in camera review of privileged material, a trial court applies the materiality standard, which is a higher standard of materiality than the one applied at the reasonable certainty stage. "In terms of the reasonable certainty test, 'material' refers to evidence in the records that is exculpatory, or in other words, favorable to the defense." *Worthen*, 2009 UT 79, ¶ 48. At this stage, a defendant "is not under an obligation to show materiality apart from and in addition to the requirement that he show to a reasonable certainty that the records contain exculpatory evidence favorable to his defense in order to obtain in camera review." *Id.* It is only after the court grants in camera review of the records that the court is called upon to determine whether the records are

material, i.e., whether "there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different." *Id.* ¶ 43 (quotation simplified). *See also id.* ("[A]n analysis of the materiality of the requested privileged records . . . is properly made at the time of the in camera review by the trial court, not prior."). Additionally, the court may determine whether the requested records amount to cumulative evidence only following in camera review, not before. *Id.* ¶¶ 43, 50.

¶34    Thus, the trial court's statement that the Magellan records presented a "close call" relative to whether they satisfied the reasonable certainty test does not render it "clear that [they] would meet the lower standard of materiality," as Betony suggests. The court stated that it was "a close call as to whether there is a reasonable certainty that [the Magellan records] . . . would contain exculpatory information." In other words, it was a "close call" as to whether Betony had shown to a reasonable certainty that the Magellan records contained information favorable to his defense. But because the court had prematurely reviewed those records, it ruled "as a practical matter" that Betony had satisfied the stringent reasonable certainty test and, at that point, evaluated the Magellan records for materiality. In reference to that inquiry, the court stated that it "has reviewed [the Magellan records] and . . . has determined that there is nothing exculpatory in those records . . . and nothing that would appear to be helpful to Mr. Betony's case."

¶35    Betony is correct that the court applied an incorrect standard for materiality. But, as discussed above, the standard of materiality that is supposed to be applied at the reasonable certainty stage, before an in camera review is undertaken, is *lower* than the standard of materiality applied during in camera review to determine whether the records should be turned over to the defendant. *Compare Worthen*, 2009 UT 79, ¶ 48 ("In terms of the reasonable certainty test, 'material' refers to evidence in

the records that is exculpatory, or in other words, favorable to the defense."), *with id.* ¶ 43 (stating that following in camera review of the records, "the trial court must deem evidence material where there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different") (quotation simplified). Thus, Betony's argument fails because it does not follow that the Magellan records would satisfy the correct, more stringent materiality standard given that the court concluded those records failed to satisfy even the more lenient standard that the court incorrectly applied.

¶36  Nevertheless, because "the existence of a privilege or an exception thereto is a question of law," we must determine de novo whether the Magellan records were material.[8] *State v. Worthen*, 2008 UT App 23, ¶ 9, 177 P.3d 664 (quotation simplified), *aff'd*, 2009 UT 79, 222 P.3d 1144. *See State v. Bell*, 2020 UT 38, ¶ 10, 469 P.3d 929. Betony argues that the Magellan records were material because they "had quality and probative value to support the [Southwest records] that were admitted, as well as [Psychologist's] testimony that [Andrew] could not be considered to report reliably—they would serve as a confirmation to [Andrew's] problems." This supposition is an insufficient basis on which to conclude "there is a reasonable probability that, if the evidence [had been] disclosed to the defense, the result of the proceeding" [would have been]

_____

8. We acknowledge that "[i]n the context of a case yet to go to trial, the test becomes more difficult to apply because the trial court must anticipate the efficacy of the material contained in the records in persuading the fact-finder to discredit the victim," *see State v. Blake*, 2002 UT 113, ¶ 23, 63 P.3d 56, whereas an appellate court has the benefit of reviewing the material in the context of a trial that has already taken place.

different." *See State v. Worthen*, 2009 UT 79, ¶ 43, 222 P.3d 1144 (quotation simplified).

¶37 Even without these records, Psychologist testified that, "within a reasonable degree of professional forensic psychological certainty, the children's testimony has been tainted by the effects of repeated trauma as well as multiple suggestive influences." Regarding Andrew specifically, he concluded, "within a reasonable degree of forensic psychological certainty, . . . that the effects of trauma and extensive trauma have made [Andrew's] testimony unreliable." Psychologist provided extensive examples of such traumas throughout his testimony, which he gleaned from the Southwest records and other sources. Furthermore, Psychologist attributed the limitations of his testimony not to any shortcomings of the records and documents he had reviewed but to the fact that he had not personally examined Andrew.

¶38 Accordingly, given Psychologist's firm conclusions regarding the lack of reliability of Andrew's and his siblings' testimony, it is unclear how, had Psychologist been given access to the Magellan records, his conclusions could have been any more favorable to Betony's defense, let alone to the extent that it would have created a reasonable probability that the trial court would have acquitted him of some or all of the charges. Indeed, on appeal, Betony does not provide specific examples other than to generally state that the Magellan records "would have supported or, at a minimum, given the defense, its witnesses and the court the entire evidentiary picture rather than one having to be pieced together from various sources with holes as to the actual written history."

¶39 For the foregoing reasons, the Magellan records did not satisfy the materiality standard, and therefore the exception outlined in rule 506(d)(1)(A) did not apply to those privileged

documents so as to require their disclosure to Betony and their subsequent use at trial.

CONCLUSION

¶40     Because there is no reasonable probability that the outcome of Betony's trial would have been different had he obtained access to the Magellan records, those records were not material, and the trial court did not err in denying Betony's request for their disclosure.

¶41     Affirmed.

_____