2002 UT 113

**STATE of Utah, Plaintiff and Appellee,**

v.

**Damond BLAKE, Defendant and Appellant.**

No. 20000967.

Supreme Court of Utah.

Nov. 26, 2002.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., and Michaela Andruzzi, Salt Lake City, for plaintiff.

Susanne Gustin–Furgis, Salt Lake City, for defendant.

Kara L. Barton, Salt Lake City, Douglas E. Beloof, Gina S. McClard, Portland, Oregon, Wendy Murphy, Boston, Massachusetts, for amicus Rape Recovery Center.

WILKINS, Justice:

¶ 1 Defendant, Damond Blake ("Blake"), brings this interlocutory appeal from the denial of his request for discovery of the victim's mental health and juvenile court records for use in defending himself against charges of sexual abuse of a child, S.D. He further challenges the denial of a motion for a hearing, pursuant to rule 412 of the Utah Rules of Evidence ("412 hearing"), to explore S.D.'s sexual past and whether there have been any prior accusations of crimes similar to that alleged here. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Blake is charged with sexual abuse of a child for alleged sexual misconduct with his then girlfriend's twelve-year-old daughter, S.D. At a preliminary hearing, after which Blake was bound over for trial, S.D. was asked by Blake's counsel if she had ever accused anyone else of similar incidents. After an initially vague answer, she denied that she had ever done so. Upon conclusion of this line of questioning, Blake requested that the court allow him to conduct a 412 hearing to inquire about S.D.'s sexual history, particularly any past allegations of sexual abuse made by S.D. against others, and any drug and alcohol use by S.D. The trial court denied this request. In other questioning, S.D. admitted to a stay in juvenile detention and a juvenile record for theft. Further, Blake uncovered the fact that S.D. had received counseling in connection with the assault he allegedly committed.

¶ 3 After the preliminary hearing, Blake attempted to discover sensitive information relating to S.D.'s answers at the preliminary hearing, including school grade reports, DCFS reports, juvenile detention and arrest records, and mental health records. Because Blake has obtained the DCFS reports and school grade reports, they are not a part of this appeal.[1] The other records sought were in the custody of the various agencies and entities with which they originated. Though the custodians of the records were subpoenaed, Blake never brought the custodians of those records before the court.

¶ 4 In conjunction with Blake's requests for discovery and a 412 hearing, which were denied, the trial court determined that the sought-after records were not in possession of the prosecution and that the mental health records were privileged material, not subject to discovery. The court also found that there was no evidence that S.D.'s preliminary hearing testimony was unreliable or that she had made prior accusations of sexual assault.

¶ 5 The court denied the request for a 412 hearing on the ground that the defendant

1. Because the DCFS and school records have already been provided, we express no opinion as to whether defendant was entitled to their production, or could have compelled discovery.

failed to meet the requirement of rule 412(c) of the Utah Rules of Evidence that a party file a motion "stat[ing] with specificity the evidence ... sought to [be] admitted and the purpose for its admission." Blake's request for S.D.'s juvenile records was denied by the court because the records were not in possession of the State; the court further held that such records were closed. Applying the privilege of rule 506 of the Utah Rules of Evidence, the court also denied the request for S.D.'s counseling records. The court determined that rule 506 did not allow discovery of material intended only for impeachment, that Blake merely made a general request for information, and that there was no evidence of prior accusations of another or unreliable testimony by S.D. Further, the court noted the State's substantial interest in protecting counseling relationships and the chilling effect of piercing that relationship.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 6 As to Blake's request for a 412 hearing, we review the question of law for correctness while deferring to the lower court's "subsidiary factual determinations." *State v. Quinonez-Gaiton*, 2002 UT App 273, ¶ 9, 54 P.3d 139 (internal quotations and citations omitted). Decisions regarding the release of juvenile court records are governed by statute and reviewed for correctness. *See State v. Casey*, 2002 UT 29, ¶ 19, 44 P.3d 756. A court's decision regarding "the existence of a privilege is a question of law for the court," and is reviewed for correctness. *Riddle v. Perry*, 2002 UT 10, ¶ 6, 40 P.3d 1128 (citations omitted).

### II. 412 HEARING

¶ 7 Blake's stated purpose in requesting a 412 hearing is to "question [the] alleged victim about prior false allegations and prior sexual abuse." However, Blake ignores the plain language of rule 412, which provides for a hearing "only if the court sees the applicability of one of the limited exceptions and intends to admit such evidence." *Quinonez-Gaiton*, 2002 UT App 273 at ¶ 12, 54 P.3d 139. In this case, Blake failed to identify any

evidence he wished to have admitted and his request for a hearing to attempt discovery of evidence was properly denied.

### III. JUVENILE COURT RECORDS

¶ 8 The records of the juvenile court and its probation department are governed by Utah Code Ann. section 78–3a–206 (Supp. 2002). That section prescribes the method by which such records may be released or opened for inspection. Blake has cited no provision, other than rule 16 of the Utah Rules of Criminal Procedure, that purports to give him the right to review S.D.'s juvenile records. Rule 16 is inapplicable where, as here, the prosecution does not have access to the requested records. Rule 16 applies only to information available to the prosecution. Utah R.Crim. P. 16 ("the prosecutor shall disclose ..."). Thus, where the prosecution has no access to the records a motion under rule 16 is ineffective to compel the records' release.

¶ 9 Blake also refers this court to *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) for support of his argument for access to S.D.'s juvenile records. However, as the State has correctly noted, *Davis* dealt with the question of admissibility of such records on cross-examination, not discovery. *See generally Davis*, 415 U.S. at 315–16, 94 S.Ct. 1105 (noting Sixth Amendment right to confront witnesses through impeachment on cross-examination). Accordingly, *Davis* avails Blake nothing. The trial court's ruling is affirmed.

### IV. COUNSELING RECORDS

¶ 10 Women and children represent a disproportionate number of the rape and assault victims in our society. Historically, the law has failed to adequately protect these victims; however, recent efforts have been made to correct this injustice. It has been suggested that there is an imaginary pendulum swinging from one end—poor treatment of victims—to the other—unjust treatment of defendants—in the desire to protect victims. The premise of Blake's argument is that the pendulum has swung too far from the historically poor treatment of victims and reached

the other end, treating defendants unjustly. We agree that in the event the protection of victims prevents a fair trial of those accused of rape or sexual assault, the right to a fair trial must be preserved. We have not yet reached that point.

### A. Historical Treatment of Rape and Sexual Assault Victims

¶ 11 The revelation that women victims of rape have long been mistreated by the law is a relatively recent development. Courts have long held institution-wide distrust of rape victims in cases where they were acquainted with their assailants. *See* Susan Estrich, *Real Rape* 28–29 (1987) (discussing suspicion of women victims and legal presumptions against women in "simple," as opposed to "stranger" rapes). As recently as the mid-twentieth century, articles in the nation's most prestigious legal journals openly suggested that the testimony of female rape victims was not to be trusted. Note the language of one such journal: "a woman's need for sexual satisfaction may lead to the unconscious desire for forceful penetration, the coercion serving neatly to avoid the guilt feeling which might arise after willing participation." Note, *Forcible and Statutory Rape: An Exploration of the Operation and Objectives of the Consent Standard*, 62 Yale L.J. 55, 67 (1952). Yet another: "a woman may note a man's brutal nature and be attracted to him rather than repulsed. Masochistic tendencies seem to lead many women to seek men who will ill-treat them sexually." Note, *The Resistance Standard in Rape Legislation*, 18 Stan. L.Rev. 680, 682 (1966). The tone of the literature had begun to change by the 1980s when Professor Susan Estrich of the University of Southern California authored an extensive law review article, entitled *Rape*, and her related book, *Real Rape*. These works present a thorough survey of the historical treatment of women rape victims and are useful for understanding the issue now before this court.

¶ 12 Estrich notes that the law has been accommodating of victims of rape where a stranger forcibly attacks the victim while it has been leery of victims raped by acquaintances. *Real Rape, supra,* at 28–29. The vehicles for institutionalized suspicion of rape complainants have typically been non-consent, corroboration, and other related requirements, where the focus is shifted to the victim's acts, rather than the defendant's. *Id.* at 29 (noting that rape victims are required to show non-consent by physical resistance). While the non-consent standard and its related requirements may initially seem benign and similar to requirements in other criminal matters, such as theft and trespassing, Professor Estrich suggests that they have been applied very differently in rape cases than in the others. *See, e.g.,* Susan Estrich, *Rape*, 95 Yale L.J. 1087, 1094 (1986) (stating, "The definition of rape stands in striking contrast to this tradition, because courts, in defining the crime, have focused almost incidentally on the defendant—and almost entirely on the victim.").

¶ 13 Illustrative of the difference between rape and other crimes is the non-consent requirement. The non-consent requirement for a rape conviction has been expressed not as non-consent is in trespass but in terms of the victim's resistance. In the words of one court, "[n]ot only must there be entire absence of mental consent or assent, but there must be the most vehement exercise of every physical means or faculty within the woman's power to resist the penetration of her person, and this must be shown to persist until the offense is consummated." *Brown v. State,* 127 Wis. 193, 106 N.W. 536, 538 (1906). This degree of non-consent is not paralleled by tests for non-consent in cases other than rape. *Real Rape, supra,* at 40–41 (noting that non-consent in trespass cases requires only verbal or posted warnings).

¶ 14 In addition to the resistance requirement, the law of many states has further failed victims by requiring evidentiary corroboration of a victim's testimony, allowing evidence of a victim's sexual past, and mandating jury instructions cautioning juries against giving too much weight to victims' testimony. *Id.* at 42 (corroboration), 47 (sexual past), 54–55 (cautionary instruction). By the 1980s these requirements had "enshrined distrust of women in the law . . . and ensured that rape trials would indeed be *real* nightmares—for the women victims." *Id.* at 56.

One unfortunate result of the law's mistreatment and distrust has been that women raped by acquaintances, as opposed to strangers, are much less likely to report those rapes to police. *See id.* at 10–12 (noting widely divergent reporting statistics in stranger and acquaintance rapes and citing various surveys to that effect); Wendy J. Murphy, *Minimizing the Likelihood of Discovery of Victims' Counseling Records and Other Personal Information in Criminal Cases: Massachusetts Gives a Nod to a Constitutional Right to Confidentiality,* 32 New Eng. L.Rev. 983, 1016–17 (1998) (noting judicial recognition of decline in reporting when records not protected).

¶ 15 In an effort to remedy many of the past failings of the law in relation to victims of rape and similar sexual crimes, many jurisdictions have reformed rape laws. *E.g., Real Rape, supra,* at 57 (noting that corroboration requirements have been discarded and rape shield statutes often protect information about victims' sexual pasts). Utah has enacted both statutes and rules of evidence designed specifically to protect the victims of sexual assaults. Utah Code Ann. §§ 78–3c–1 to –4 (1996) (invoking privilege in rape crisis counseling); Utah R. Evid. 412 (preventing most uses of evidence of victim's sexual behavior). While these provisions apply specifically to victims of sexual assaults, the more general movement toward recognizing the rights of all crime victims has given birth to other provisions in Utah law that extend to victims of sexual assault.

### B. The Victims' Rights Amendment

¶ 16 We discuss the victims' rights amendment to Utah's Constitution ("the amendment") to provide useful context for our review of past and current treatment of rape and sexual assault victims. However, because "[r]ules, like statutes, are to be construed to avoid constitutional interpretation where possible," we do not decide this case by resorting to Utah's victims' rights amendment. *Preuss v. Wilkerson,* 858 P.2d 1362, 1362–63 (Utah 1993). The amendment recognizes specific rights of crime victims. Among those rights is the right "[t]o be treated with fairness, respect, and dignity, and to be free from harassment and abuse throughout the criminal justice process." Utah Const. art. I, § 28(1)(a). This provision was enacted in response to an increasing recognition that:

> Victims who do survive their attack, and are brave enough to come forward, turn to their government expecting it to ... protect the innocent.... Without the cooperation of victims and witnesses in reporting and testifying about crime, it is impossible in a free society to hold criminals accountable. When victims come forward to perform this vital service, however, they find little protection. They discover instead that they will be treated as appendages of a system appallingly out of balance. They learn that somewhere along the way the system has lost track of the simple truth that it is supposed to be fair and to protect those who obey the law while punishing those who break it. Somewhere along the way, the system began to serve lawyers and defendants, treating victims with institutionalized disinterest.

President's Task Force on Victims of Crime, Final Report, iv (1982) (quoted in Paul Cassell, *Balancing the Scales of Justice: The Case for and the Effects of Utah's Victims' Rights Amendment,* 1994 Utah L.Rev. 1373, 1379). Utah law now recognizes that victims have fared poorly in the criminal justice system and that they are to be more involved in the process of punishing the acts of which they became unwilling participants.

### C. Rule 506 Privilege

¶ 17 Rule 506 of the Utah Rules of Evidence controls our decision today. Utah law provides for a statutory privilege for certain sexual assault counseling. However, as the State has noted, that privilege does not apply in this case. The counseling S.D. received does not meet the definition provided in section 78–3c–3 of the Utah Code, accordingly, we agree that any privilege in this case must be supported by other authority. *See* Utah Code Ann. § 78–3c–3 (1996) (defining "rape crisis center" and "sexual assault counselor" to exclude the counseling received by S.D.). We thus resort to rule 506 of the Utah Rules of Evidence for analysis of the applicability

of the therapist-patient privilege to S.D.'s counseling records.

¶ 18 Rule 506 cloaks in privilege confidential communications between a patient and her therapist in matters regarding treatment. Utah R. Evid. 506(b). The very nature of all privileges means that they will sometimes "interfere with establishment of the whole truth." Utah R. Evid. 501 advisory committee notes. Nevertheless, the various rules of privilege are recognized as "reflect[ing] good policy choices, fostering candor in important relationships by promising protection of confidential disclosures." *Id.* Although this privilege is an important one, the rule provides exceptions in certain circumstances, one of which Blake suggests is applicable here. Utah R. Evid. 506(d) (listing exceptions). Specifically, it provides that no privilege will exist if an otherwise covered communication is "relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which that condition is an element of any claim or defense." *Id.* at (d)(1). We have had occasion to consider the boundaries of this exception in previous cases, particularly *State v. Cardall,* 1999 UT 51, 982 P.2d 79. We take this opportunity to clarify the standard and test laid out in *Cardall.*

1. *In Camera* Review

¶ 19 We have previously recognized that there are situations in which otherwise privileged communications between a crime victim and her therapist might be subject to *in camera* review and disclosure. *Cardall,* 1999 UT 51, at ¶¶ 29–35, 982 P.2d 79. We noted in *Cardall* that the disclosure of such material was limited and required a showing "with reasonable certainty that exculpatory evidence exists which would be favorable to [the] defense." *Id.* at ¶ 30. In the context of this case it is not enough to show that the counseling records exist. Blake must show, with reasonable certainty, that the sought-after records actually contain "exculpatory evidence . . . which would be favorable to his

defense." *Cardall,* 1999 UT 51 at ¶ 30, 982 P.2d 79. This is a stringent test, necessarily requiring some type of extrinsic indication that the evidence within the records exists and will, in fact, be exculpatory.[2] The difficulty in meeting this test is deliberate and prudent in light of the sensitivity of these types of records and the worsening of under-reporting problems in the absence of a strong privilege. *See supra* Part IV., A. (noting problems of under-reporting); *see also,* Murphy, *supra,* at 1016–17 (noting judicial recognition of decline in reporting when records not protected). Exactly how much is required to satisfy the "reasonable certainty" test of *Cardall* varies with each case, nevertheless, we will attempt to give some guidance.

¶ 20 Standards such as "reasonable certainty" or "reasonable probability" elude quantification. *See State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987) (noting an imaginary spectrum and recognizing inability to "assign a definite spot on the spectrum" to the reasonable probability standard). While we cannot define the precise limits of such standards, we can determine their place relative to one another. Discussing a variety of these elusive tests in another context, we explained that the reasonable probability standard lies somewhere between "mere possibility" and "more likely than not." *Id.* at 920. On a similar spectrum, "reasonable certainty," within the meaning of *Cardall,* lies on the more stringent side of "more likely than not."

¶ 21 Accordingly, the mere speculation offered by Blake that S.D.'s counseling records might contain exculpatory evidence useful to his case is clearly not enough to warrant *in camera* review. The following represents a summary of Blake's stated basis for review of S.D.'s counseling records: "[t]he mental health records . . . are important because it [sic] may have information about medication she's taking that effect her credibility; about whether she has recanted or not . . . [a]lso, she may have a mental illness where part of

---

2. Blake seeks disclosure of the counseling records for use in impeaching the victim's testimony. It is unlikely that impeachment evidence qualifies as an element of a claim or defense. However, we need not reach the question of whether an element of a claim or defense is implicated since Blake has not shown with reasonable certainty that the records he seeks contain exculpatory evidence.

the diagnosis is chronic lying." This situation differs markedly from cases where a criminal defendant can point to information from outside sources suggesting that a victim has recanted or accused another of the crime alleged or has a history of mental illness relevant to the victim's ability to accurately report on the assault.

¶ 22 One difference between Blake's request and a request likely to be successful was hinted at in *Cardall.* 1999 UT 51 at ¶¶ 32–33, 982 P.2d 79 (discussing specific requests versus general requests). Where a defendant's request for *in camera* review is accompanied by specific facts justifying the review, a court will be much more likely to find "with reasonable certainty that exculpatory evidence exists which would be favorable to his defense." *Id.* at ¶ 30. However, when the request is a general one, such as the request in this case for any impeachment material that might happen to be found in the privileged records, a court ought not to grant *in camera* review. At a minimum, specific facts must be alleged. These might include references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that might lead to uncertainty regarding a victim's trustworthiness. This listing is not intended to be exclusive, but is only an example of the type and quality of proof needed to overcome the high *Cardall* hurdle.

2. Materiality and Disclosure

¶ 23 Upon satisfying the "reasonable certainty" test, the court would then conduct an *in camera* review for materiality. This review is conducted using a "reasonable probability" standard. Under this standard, evidence is deemed material where there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different. *Cardall,* 1999 UT 51 at ¶ 30, 982 P.2d 79. In the context of a case yet to go to trial, the test becomes more difficult to apply because the trial court must anticipate the efficacy of the material contained in the records in persuading the fact-finder to discredit the victim. *See, e.g.,*

Chauncey B. Wood, Note, *Rape Prosecutions and Privileged Psychological Counselling Records: How much does a Defendant have a Right to Know about his Accuser?,* 3 B.U. Pub. Int. L.J. 351, 374 (1993) (noting necessity and difficulty of anticipating defendant's case and evaluating information reviewed *in camera*). Despite the problems inherent in *in camera* review without the presence of counsel, such review represents a satisfactory method of balancing the interests of privacy and full reporting of crime with defendants' ability to present the best case at trial. Accordingly, it is the method of review we adopt.

¶ 24 In this instance, Blake has failed to meet the necessary minimum showing, that of a reasonable certainty that exculpatory evidence exists which would be favorable to his defense. As such, his challenge fails and we affirm the decision of the trial court.

## CONCLUSION

¶ 25 Rule 412 provides for a hearing only when the trial court intends to admit evidence. Blake has proffered no evidence for admission. We therefore affirm the trial court's denial of that request. Furthermore, no authority exists for the release of S.D.'s juvenile records and we affirm the denial of that request. Blake has likewise not met the minimum showing required to trigger *in camera* review of S.D.'s counseling records and we affirm that denial. We remand to the trial court for further proceedings consistent with this opinion.

¶ 26 Chief Justice DURHAM and Associate Chief Justice DURRANT concur in Justice WILKINS' opinion.

¶ 27 Justice HOWE and Justice RUSSON concur in the result.