**2024 UT App 181**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DOUGLAS LAWRENCE WARDLE,
Appellant.

Opinion
No. 20230761-CA
Filed December 12, 2024

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 211908187

Sarah J. Carlquist and Amy Powers,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1    The State has charged Douglas Lawrence Wardle with raping his then-ten-year-old niece (Niece) on two occasions in 2001. The charges were filed in 2021, soon after Niece reported the rapes to the police, telling them that she had "blocked" the incidents "out of her mind" for many years and had only "recently remembered" them after "experiencing medical issues" and undergoing "therapy." Prior to trial, Wardle filed a motion asking the district court to undertake an in-camera review of Niece's medical and therapy records generated around the time of her disclosures to police. The district court denied that motion,

concluding that Niece's records were privileged and were not subject to any exception to the privilege.

¶2    Wardle sought permission to take an interlocutory appeal from the district court's order denying his motion. We granted Wardle permission to do so, and we now address the merits of his appellate challenge. We conclude that, on this record, Wardle has made the showing required to establish an exception to the privilege, and we therefore hold that the district court erred by determining that the requested records were privileged. Accordingly, we remand the case for further proceedings.

BACKGROUND[1]

¶3    In April 2020, Niece contacted a local police officer (Officer) by telephone and stated that Wardle had raped her in 2001, when she was about ten years old. According to the written report Officer made of the call, Niece "said she blocked th[e] incident out of her mind and recently remembered it after having experienced medical issues." Niece stated that, in 2001, Wardle had come to live with her family for approximately three months. During that time, Niece's parents apparently worked long hours, and Niece told Officer that on one occasion when she was home alone with Wardle, he entered her bedroom while she was reading a book and raped her. She reported that, in the process, Wardle had

---

1. Because this case comes to us on interlocutory appeal and there has not yet been a trial, our recitation of the facts comes from relevant case documents. It should go without saying that none of these facts have been proved in court beyond a reasonable doubt, and until then, Wardle retains the presumption of innocence. *See* Utah Code § 76-1-501(1) ("A defendant in a criminal proceeding is presumed to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt").

strangled her and that she had "ended up passing out." She also remembered that she had been wearing a dress that day.

¶4      About a month later, Niece called Officer to provide more information about the incident she had reported earlier. She indicated that she had remembered these additional things on the same night as her previous phone call to Officer and that she "wrote them down" at that point, but that she "took a few days to call" back because she was finding the situation "difficult to cope with." During this second call, Niece explained that she had been wearing a blue shirt and bell-bottom jeans, not a dress. She remembered the name of the book she had been reading—a fantasy book—and that she had been telling Wardle about the story. She stated that the rape occurred at around four or five in the afternoon and that her blinds were partially open. She reported that Wardle had unbuttoned her pants to see if she was "wearing pretty underwear" and then started to take off her pants. She stated that, at this point, she had tried to move away, but that Wardle had pulled on her left leg, causing her to hit her head and feel dizzy. Niece also reported that she saw and recognized "a familiar man" outside her window and tried to call for help, but that the man could not hear her. She stated that she tried multiple times to push Wardle off her but that she was unable to do so. Officer noted in his report that Niece was "very emotional" while describing the events.

¶5      Some nine months later, in February 2021, Niece called Officer again. Officer's report of this call states that Niece "told [Officer] that she had been going to therapy and ha[d] remembered more about her childhood experiences with [Wardle]." Niece stated that the rape she had reported in the first two calls with Officer had been "the first time [Wardle] did anything to her, but that she was raped more than this." She told Officer that she now "remember[ed] being raped in her mother's room and . . . being touched on the vagina through a cut hole [in] her dancer pants while stretching in the front room." Niece also

said that Wardle made her wear her mother's wedding ring, and that she had kept a journal of what was happening but that Wardle had "burned her journal over the kitchen sink."

¶6 In August 2021, the State charged Wardle with two counts of rape of a child, first-degree felonies. A few months later, the district court held a preliminary hearing and bound Wardle over for trial on both charges.

¶7 In October 2022, Wardle filed a motion asking "for permission to serve a subpoena duces tecum, pursuant to a court order, requiring production of medical/mental health records pertaining to" Niece generated between March 2020 and March 2021, roughly the period in which Niece made her disclosures to Officer. Wardle acknowledged the existence of a privilege, set forth in rule 506 of the Utah Rules of Evidence, that protects medical and mental health records. But Wardle asserted that an exception to that privilege existed here because the records were "relevant to an issue of the physical, mental, or emotional condition of the patient . . . in [a] proceeding in which that condition is an element of any claim or defense." *See* Utah R. Evid. 506(d)(1)(A) (2022).[2] Wardle claimed that the "condition" at issue was "the fact that [the memories] were recently recalled after medical issues, which caused [Niece] to recall an alleged event from twenty years prior." Wardle then argued that the condition is "germane to the identification defense—that [Niece] possibly misidentified" Wardle as the abuser—and that the condition is also "germane to a defense regarding her ability to testify competently." Wardle also argued that the condition is relevant "to impeachment regarding motive." Finally, Wardle asserted—

---

2. Rule 506 has since been amended, effective May 1, 2024. Because both parties agree that the 2024 changes are not directly relevant to the issues presented in this appeal, we apply the version of the law in effect in 2022, at the time Wardle filed the motion for in-camera review.

pointing to the language Officer used in the reports indicating that Niece had "blocked" her memories of the events and had only "recently remembered" them after "experiencing medical issues" and undergoing "therapy"—that "there is a reasonable certainty that [Niece's] records contain exculpatory evidence."

¶8 The State filed no response to Wardle's motion. But an attorney representing Niece filed a memorandum in opposition to the motion, asserting that Niece did not suffer from a physical, mental, or emotional condition; that no such condition was an element of any claim or defense; and that Wardle had not shown that the sought-after records were reasonably certain to contain exculpatory evidence.

¶9 At oral argument on his motion, Wardle clarified that he was seeking only the medical and mental health records from the time period during which (and just before) Niece was in contact with police about the alleged incidents. Wardle argued that, according to the police reports, the initial incident "came to light because of [a] medical issue." And he argued that, after Niece attended therapy, "suddenly there is a new memory of a whole new allegation," and he pointed to language from the report indicating that the therapy helped Niece "remember more details about the allegations." Wardle also argued that the "mental or emotional condition" at issue was Niece's "poor memory" and that Niece indicated that the memories had suddenly surfaced after medical issues and after therapy. Wardle stated that he was seeking in-camera review of the records to "see what inconsistencies or what concerns there are about her memory about the event and the allegations," and he indicated that he was potentially interested in having an expert review the records.

¶10 In response, Niece's attorney argued that Niece's memory issues do not qualify as a "condition" because "memory is always going to be an issue, memory is not a diagnosable mental health condition." The attorney acknowledged that Wardle had "done a

good job of narrowing down" the time period in his request, but she argued that the request was nonetheless "not made with any particularity" and that Wardle could not allege that the records "contain . . . things that relate to [the] case."

¶11   After argument, the court denied Wardle's motion. The court stated that, "while the request [was] somewhat limited as to time[,] it [didn't] specify a particular provide[r] or subject matter" and was therefore "lacking the particularity required" by rule 14(b)(2) of the Utah Rules of Criminal Procedure. The court also stated that Wardle "hasn't shown [that Niece] suffers from a physical, mental or emotional condition" because, in the court's view, a "poor memory of events alleged to have occurred some 20 years ago" does not qualify as a condition. The court also stated that, even if Niece's memory issues did qualify as a condition, that condition is not relevant to Wardle's defense. Finally, the court concluded that Wardle "failed to show to a reasonable certainty that the records . . . contain exculpatory evidence." Later, the court issued a written order memorializing its oral ruling.

¶12   Wardle timely filed a petition seeking permission to take an interlocutory appeal from that order. We granted Wardle permission to take such an appeal.

### ISSUE AND STANDARD OF REVIEW

¶13   Wardle presents one issue for our review: whether the district court erred in determining that no exception to the rule 506 privilege applies here.[3] To the extent that "the existence of a privilege . . . turns on a question of law, we review for

---

3. Notably, Wardle does not appeal the court's alternative ground for denial of his motion: that his request was not particular enough to satisfy rule 14(b)(2) of the Utah Rules of Criminal Procedure. We discuss the implications of this more fully below.

correctness." *State v. Bell*, 2020 UT 38, ¶ 10, 469 P.3d 929 (quotation simplified). However, "we give deference to the district court's underlying fact finding and do not set those findings aside unless they are clearly erroneous." *Id*. (quotation simplified).

## ANALYSIS

¶14 Utah's evidentiary rules establish that "[a] patient has a privilege, during the patient's life, to refuse to disclose and to prevent any other person from disclosing information that is communicated in confidence to a physician or mental health therapist for the purpose of diagnosing or treating the patient." Utah R. Evid. 506(b) (2022). All parties agree that the records Wardle seeks in this case fall within the ambit of this privilege.

¶15 But the privilege has certain exceptions. One such exception provides that "no privilege exists" for "communications relevant to an issue of the physical, mental, or emotional condition of the patient," if the "condition is an element of any claim or defense" made in the relevant "proceeding." *Id*. R. 506(d)(1)(A). Wardle maintains that the records he seeks are subject to this exception and that they are therefore discoverable in this proceeding.

¶16 Our supreme court has instituted a three-part test to be applied in cases in which records are sought under this exception. First, the party seeking the records must show "that the patient has a 'physical, mental, or emotional condition.'" *See Bell*, 2020 UT 38, ¶ 15 (quoting Utah R. Evid. 506(d)(1)). Second, the requesting party must show that the identified condition is an element of a claim or defense in the proceeding. *Id.* And third, the requesting party "must also demonstrate that, with reasonable certainty, exculpatory evidence exists in the [requested records] which would be favorable to" the requesting party's position. *Id.* (quotation simplified). Our supreme court has instructed that

"[t]his three-part showing is a sequential test," meaning that "a court must not proceed to the next step in the analysis if it determines the [requesting party] failed to meet his or her burden of proof at a previous point." *Id*. ¶ 16.

¶17    The district court determined that Wardle could not make the required showing on any of the three parts of the test. We address each part, in turn, and conclude that Wardle has indeed made the required showing at each step.

## I. Physical, Mental, or Emotional Condition

¶18    A "condition" for purposes of rule 506(d)(1)'s exception "is not limited to diagnosable disorders or illnesses." *State v. Worthen*, 2009 UT 79, ¶ 21, 222 P.3d 1144. Nevertheless, matters that are merely "transitory or ephemeral," such as "mere expressions of emotion," will not qualify as a "condition." *Id.* With these principles in mind, our supreme court has prescribed this working definition of a mental or emotional "condition": "A mental or an emotional condition is a state that persists over time and significantly affects a person's perceptions, behavior, or decision making in a way that is relevant to the reliability of the person's testimony." *Id.* In *Worthen*, for instance, our supreme court determined that an alleged victim's "chronic and persistent" "frustration with, and hatred toward her parents"—one of whom she had accused of sexually abusing her—qualified as "an emotional condition contemplated by" rule 506(d)(1). *Id*. ¶ 28 (quotation simplified). By contrast, in *State v. Bell*, our supreme court determined that an alleged victim's later willingness to talk to investigators—after therapy and after initially refusing to talk—was not a "condition" as contemplated by rule 506(d)(1). 2020 UT 38, ¶¶ 21–22 (quotation simplified).

¶19    In Wardle's view, the relevant "condition" in this case is Niece's "blocked" memory or, as he puts it, "her persistent twenty-year inability to remember the incidents in question at

all." The State acknowledges, in response, that "true 'recovered memories' . . . may well constitute a 'condition' under rule 506(d)(1)," but it asserts that this case is simply a "poor memory" case and not a "recovered memories" case. The district court appeared to align itself with the State's current position, offering its view that a "poor memory of events alleged to have occurred some 20 years ago" does not qualify as a "condition."

¶20　Wardle responds to these arguments by directing our attention to Niece's own words, as reflected in Officer's reports. As recounted in those reports, Niece did not simply have a "poor memory" of the events in question, nor is there any indication that she had simply been unwilling, over the years, to discuss unpleasant events that had always been in her memory. Rather, she indicated that she had entirely "blocked" the relevant incidents "out of her mind" and had only "recently remembered" them "after having experienced medical issues" and undergoing "therapy." As Wardle points out, Niece herself thus directly linked her sudden ability to recall the earlier incidents to her medical issues and, later, to her therapy visits.

¶21　We are persuaded that, on this record, Wardle has borne his burden of demonstrating that Niece had a "physical, mental, or emotional condition," Utah R. Evid. 506(d)(1) (2022), that had "persist[ed] over time" and appears to have "significantly affect[ed her] perceptions . . . in a way that is relevant to the reliability of [her] testimony," *see Worthen*, 2009 UT 79, ¶ 21. The facts of this case, as relevant to the "condition" inquiry, are much more similar to *Worthen* than they are to *Bell*. In this case, the condition—the apparent inability to recall the incidents in question[4]—lasted for nearly two decades and is therefore far from

_____

4. We do not purport to decide whether Niece's condition constitutes "repressed memory" as that term was used in *Franklin v. Stevenson*, 1999 UT 61, ¶¶ 3, 15, 987 P.2d 22. Regardless of the

(continued…)

"transitory or ephemeral." *Id.* And the condition, almost by definition, appears to have "significantly affect[ed]" Niece's "perceptions" of her childhood interactions with Wardle "in a way that is relevant to the reliability of" her eventual trial testimony. *See id.* On the record before us, this is not simply a case of poor memory or initial unwillingness to discuss unpleasant events. Accordingly, the district court erred in concluding that this case does not involve a "condition," as that term is used in rule 506(d)(1).

## II. Element of a Claim or Defense

¶22   Once a court has established that the patient has a condition, the next inquiry is whether that condition is "an element of any claim or defense" being made by the parties in the "proceeding." Utah R. Evid. 506(d)(1)(A) (2022). In a criminal case, a condition constitutes an element of a claim or defense if it has the potential to "interject[] reasonable doubt into the elements the State bears the burden to prove." *Worthen*, 2009 UT 79, ¶ 31. Impeachment evidence can qualify as an "element of" a criminal defendant's defense, at least where that evidence goes to a specific credibility issue and is not merely part of a challenge to "the general credibility of the witness." *Id.* ¶¶ 35–36.

¶23   In *Worthen*, as noted, our supreme court determined that the alleged victim's "anger and hatred" toward her parents was a "condition" under rule 506(d)(1). *Id.* ¶ 28. In applying the second element of the three-part test, the court analyzed the defendant's specific arguments, and it concluded that the defendant was not

label used to describe the situation, our holding is simply that an alleged victim's long-standing and complete inability, over the course of many years, to recall incidents that the victim is later able to remember only after medical or therapeutic consultation and that later form the basis for criminal charges constitutes a "condition" for purposes of rule 506(d)(1).

"simply arguing [that he] didn't do it, but rather [was] making the claim that [the alleged victim] has a mental or emotional condition of extreme hatred, which has caused her to fabricate abuse allegations." *Id.* ¶ 37 (quotation simplified). On these facts, the court held that the condition in question—the alleged victim's hatred toward her parents—was indeed an element of the accused parent's defense to the State's charges. *Id.* ¶¶ 35–36.

¶24   The situation here is similar. In this case, Wardle's defense involves more than a general criticism of Niece's credibility. As Wardle puts it, his "defense is not simply that he didn't do it." Instead, his "defense is that [Niece's] recovered memories aren't reliable given the circumstances." On these facts, we agree with Wardle that "the ability to test the reliability of [Niece's] recovered memories goes beyond a general challenge to [Niece's] credibility" and that therefore the condition in question—Niece's twenty-year inability to recall the events at issue—is an element of Wardle's defense to the State's charges.

### III. Reasonable Certainty

¶25   The third and final element of the three-part test is not directly derived from the language of rule 506 but is instead judicially created. *See id.* ¶ 15 (stating that rule 506(d)(1) has been "interpreted" to "contain the additional requirement" of reasonable certainty). Under this element of the test, the requesting party "must show, with reasonable certainty, that the sought-after records actually contain exculpatory evidence which would be favorable to" the requesting party's claims or defenses.[5]

---

5. In *State v. Bell*, the defendant raised a constitutional challenge to the reasonable certainty part of the test. 2020 UT 38, ¶¶ 23–32, 469 P.3d 929. Our supreme court did not reach the merits of that challenge, but it stated that the defendant had articulated "an important concern" that the reasonable certainty test "may violate

(continued…)

*State v. Blake*, 2002 UT 113, ¶ 19, 63 P.3d 56 (quotation simplified); *see also Worthen*, 2009 UT 79, ¶ 15 (stating that the requesting party must "show to a reasonable certainty that the records sought contain exculpatory evidence").

¶26 The reasonable certainty test is intended to help courts strike a balance between two ostensibly competing but vitally important aims: the need to provide all criminal defendants with a fair trial and the need to protect crime victims from undue interference into their private records. *See State v. Bell*, 2020 UT 38, ¶ 32, 469 P.3d 929 (referring rule 506 to the rules committee, and directing the committee to "consider" both "the importance of maintaining a strong privilege rule" for victims as well as "respecting a criminal defendant's constitutional rights"); *see also Blake*, 2002 UT 113, ¶ 10 (discussing the competing aims of protecting crime victims and treating defendants justly).

¶27 Our supreme court has indicated that the reasonable certainty test is "stringent," and that "[t]he difficulty in meeting this test is deliberate and prudent in light of the sensitivity of these types of records and the worsening of under-reporting problems [by victims] in the absence of a strong privilege," particularly given that "[c]ourts have long held institution-wide distrust of rape victims in cases where they were acquainted with their assailants." *Blake*, 2002 UT 113, ¶¶ 11, 19. The term "reasonable certainty," in this context, "lies on the more stringent side of 'more likely than not.'" *Id.* ¶ 20.

¶28 To satisfy the reasonable certainty test, the requesting party must point to "some type of extrinsic indication," outside of

criminal defendants' due process rights by preventing them from mounting a full and fair defense," and it referred the matter to its rules committee for review. *Id.* ¶ 32. In this case, however, no party raises any constitutional challenge to the reasonable certainty test, and we therefore need not weigh in on the matter.

the sought-after records themselves, "that the evidence within the records exists and will, in fact, be exculpatory." *Id.* ¶ 19. However, the "reasonable certainty" standard "elude[s] quantification," and "[e]xactly how much is required to satisfy" the test "varies with each case." *Id.* ¶¶ 19–20 (quotation simplified). But "mere speculation" that the sought-after records "might contain exculpatory evidence . . . is clearly not enough." *Id.* ¶ 21. In *Blake*, for instance, the requesting party could not meet the test simply by postulating—without supporting extrinsic evidence—that the records "may have information about medication" the witness was taking and that the witness "may have a mental illness." *Id*; *see also id.* ¶ 22 (stating that "when the request [for records] is a general one, . . . a court ought not to grant *in camera* review").

¶29    But our supreme court, in *Blake*, offered useful guidance about what sort of extrinsic evidence would satisfy the standard. A requesting party may be able to satisfy the test if, for instance, it could point to "information from outside sources suggesting that a victim . . . has a history of mental illness relevant to the victim's ability to accurately report on the assault." *Id.* ¶ 21. More generally, the court indicated that if the requesting party could identify "specific facts justifying the review, a court will be much more likely to find with reasonable certainty that exculpatory evidence exists which would be favorable to" the requesting party. *Id.* ¶ 22 (quotation simplified). And as relevant here, the court stated that the "specific facts" necessary to satisfy the test "might include references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that *might* lead to uncertainty regarding a victim's trustworthiness." *Id.* (emphasis added).

¶30    In this case, Wardle's records request is relatively specific, and it is not simply a general unsupported complaint about Niece's credibility. For starters, Wardle has limited his request to a discrete and targeted period of time that is framed by Niece's

reports to police. Next, and significantly, Wardle's request is supported by the police reports, which in our view constitute important extrinsic evidence—containing Niece's own words, as reported by Officer—of "some disorder that might lead to uncertainty regarding" Niece's account of events. *See id.*; *see also Worthen*, 2009 UT 79, ¶ 42 (stating that the alleged victim's "journal entries constitute extrinsic evidence that [her] therapy records contain statements" that would assist the defendant). And we even discern support for Wardle's request in *Blake*'s reference to "independent allegations made by others that a victim has recanted." *See Blake*, 2002 UT 113, ¶ 22. The situation here is, in a sense, the converse of a recantation: instead of recanting a previously lodged allegation, Niece is lodging a previously "blocked" allegation.

¶31    With regard to whether any records exist at all, we are quite confident that, at a minimum, therapy records exist from the February 2021 time frame; after all, Niece told Officer that she only remembered the second incident after "going to therapy." But we acknowledge the State's point that it is not at all certain that relevant medical records exist; Niece told Officer merely that she had "experienced medical issues," which is at least potentially different than saying she took the additional step of seeking medical attention for those issues. However, we think it is a fair inference, drawn from the language used in the police reports, that Niece sought some sort of medical attention for the issues that, apparently, were significant enough to rekindle a theretofore-forgotten memory of events that occurred long ago.[6]

---

6. In any event, even if it turns out that no medical records exist because Niece did not seek medical treatment for the "issues" she told Officer about, that fact might itself be exculpatory because it could "lead to uncertainty regarding [Niece's] trustworthiness." *See State v. Blake*, 2002 UT 113, ¶ 22, 63 P.3d 56. If there are no

(continued…)

¶32    And to the extent that the records exist, we think it is reasonably certain—as that term is used in this context—that the records will contain information "that might lead to uncertainty regarding [Niece's] trustworthiness." *See id.* Niece specifically referenced "medical issues" and "therapy" as the things that triggered her memories, and therefore the records generated by visits to doctors and therapists during the relevant time period are likely to contain information that could shed some light on how these particular memories came into being some twenty years after the incidents. Such information is, of course, not guaranteed to be exculpatory, but it very well "might lead to uncertainty regarding [Niece's] trustworthiness," and it is overwhelmingly likely to be "relevant to [Niece's] ability to accurately report on" the incidents. *See id.* ¶¶ 21–22. Our supreme court's governing case law requires no more.

¶33    Thus, we conclude that Wardle has made the necessary showing under all three parts of the test, even after considering the countervailing considerations concerning a victim's right to privacy. Wardle has demonstrated that Niece has a condition that is relevant to his defense to the criminal charges, and he has demonstrated—under standards and definitions provided by governing case law—that the requested records are reasonably certain to contain exculpatory information. Thus, the exception provided in rule 506(d)(1) is applicable here, and rule 506 is no bar

---

records, then Wardle could potentially cross-examine Niece about how medical issues minor enough to necessitate no professional attention were nevertheless significant enough to trigger dormant twenty-year-old memories. If, on remand, the district court ends up conducting an in-camera review of some of Niece's records, and if that review reveals that there were in fact no medical records generated in or about April 2020, the court should note that fact in its post-review order regarding the records.

to in-camera review of the requested records. The district court erred in concluding otherwise.

## IV. Remand Instructions

¶34 Given our conclusion that the district court erred in concluding that the sought-after records were privileged, it is necessary for us to remand this case to the district court for further proceedings. But we stop short of reversing the district court's order denying Wardle's motion for in-camera review of the requested records. As we have already noted, *supra* ¶ 11, the district court's denial of Wardle's motion rested on two independent grounds: privilege and overbreadth. For the reasons set forth in this opinion, the district court shouldn't have denied Wardle's motion on privilege grounds. But Wardle hasn't asked us, in this interlocutory appeal, to review the district court's overbreadth ruling. Ordinarily, a party's failure to appeal an independent ground for a district court's decision is fatal to that party's appeal. *See Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12 ("We will not reverse a ruling of the district court that rests on independent alternative grounds where the appellant challenges only one of those grounds." (quotation simplified)). But here, in the posture of this interlocutory appeal, all parties appear to agree that the privilege issues will remain relevant on remand because Wardle remains free, during the pendency of the case, to attempt to cure any overbreadth by submitting a more narrow and targeted records request; indeed, the State did not ask us to decline to reach the privilege issues due to Wardle's decision not to challenge the overbreadth ruling. Thus, despite our conclusion that the district court's privilege analysis was in error, our ultimate disposition is to affirm the district court's order due to Wardle's failure to challenge the alternative basis for that order.

¶35 Should Wardle submit a renewed request for Niece's medical and therapy records, rule 506 should present no bar to in-camera review. The court should then analyze Wardle's request

for overbreadth, and the court should grant in-camera review if—taking into account Wardle's access to relevant information and his ability, if any, to make the request narrower—the request is "sought with particularity and [is] reasonably limited as to subject matter." *See* Utah R. Crim. P. 14(b)(2).

CONCLUSION

¶36  Under the circumstances of this case, the medical and therapy records generated by medical providers (if any) and therapists Niece saw for the "medical issues" and "therapy" referred to in the police reports are not privileged under rule 506, because Wardle has made the showing necessary for application of the privilege exception set forth in rule 506(d)(1). Thus, rule 506 presents no bar to in-camera review of such records, and the district court erred by concluding otherwise.

¶37  We nevertheless affirm the district court's order denying Wardle's request for in-camera review, because Wardle did not mount an appellate challenge to the court's alternative basis (overbreadth) for denying that request. We remand the case for further proceedings consistent with this opinion. On remand, Wardle may renew his request for in-camera review.

———————